UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PICAYUNE RANCHERIA OF THE CHUKCHANSI INDIANS, a federally recognized Indian tribe,<br><br>Plaintiff,<br><br>v.<br><br>THE CHAIR OF THE NATIONAL INDIAN GAMING COMMISSION; UNITED STATES NATIONAL INDIAN GAMING COMMISSION; NORTH FORK RANCHERIA OF MONO INDIANS, a federally recognized Indian tribe; STATION CASINOS LLC, a Nevada limited liability corporation; RED ROCK RESORTS, INC., a Delaware corporation; and SC MADERA MANAGEMENT, LLC, a California corporation,<br><br>Defendants. | No. 1:26-cv-04343-KES-SAB<br><br>**ORDER (I) DENYING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND STAY, (II) GRANTING THE NOMINAL DEFENDANTS' MOTION TO DISMISS, AND (III) GRANTING NORTH FORK'S MOTION TO DISMISS IN PART**<br><br>Docs. 34, 35, 36 |

Picayune Rancheria of the Chukchansi Indians ("Picayune"), a federally recognized Indian tribe that owns and operates a casino on its Rancheria lands, seeks to enjoin the planned gaming activity in Madera County, California of another federally recognized Indian tribe, the North Fork Rancheria of Mono Indians of California ("North Fork"). Picayune also seeks to set aside the approval by the Chairman ("Chair") of the National Indian Gaming Commission

("NIGC") (together with the Chair, "Federal Defendants") of a management contract under which Station Casinos LLC, Red Rock Resorts, Inc., and SC Madera Management, LLC (collectively, "Nominal Defendants") are working with North Fork to operate gaming on North Fork's Indian land. Doc. 28 ("First Amended Complaint" or "FAC") at ¶¶ 7–8, 14; FAC, Prayer for Relief at ¶¶ 1–4. The Chair approved North Fork's contract with the Nominal Defendants to operate gaming on North Fork's land pursuant to his authority under the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2710 *et seq*. *See* FAC at ¶ 9.

Picayune has moved to preliminarily enjoin the planned gaming activity and to stay the approval of the management contract. Doc. 34-1 ("Picayune's Mot.") at 9–10. North Fork and the Nominal Defendants have moved to dismiss, and all defendants oppose the preliminary injunction and stay. Doc. 35-1 ("Nominal Defs.' MTD); Doc. 36-1 ("North Fork's MTD"); Doc. 39 ("Nominal Defs.' Opp."); Doc. 42 ("Fed. Defs.' Opp."); Doc. 43 ("North Fork's Opp."). For the reasons discussed below, Picayune's motion for a preliminary injunction and stay is DENIED, the Nominal Defendants' motion to dismiss is GRANTED, and North Fork's motion to dismiss is GRANTED in part.

## I. BACKGROUND

This case requires familiarity with relevant provisions of IGRA, prior events concerning gaming authorization on the Madera Parcel, and the prior federal and state litigation involving the parties. Below is an overview of these issues and the procedural background of this case.

### A. IGRA

Congress passed IGRA in 1988 "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). Other objectives include "ensur[ing] that the Indian tribe is the primary beneficiary of the gaming operation, and . . . assur[ing] that gaming is conducted fairly and honestly by both the operator and players." *Id.* § 2702(2).

IGRA addresses three classes of gaming. Class I gaming "means social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as part of, or in connection with, tribal ceremonies or celebrations." *Id.* § 2703(6). Such gaming "is

within the exclusive jurisdiction of the Indian tribes." *Id.* § 2710(a)(1). Class II gaming, which includes bingo, and certain card games, § 2703(7)(A), is more restricted. *See id.* § 2710. Class III gaming, at issue here, includes "all forms of gaming that are not class I gaming or class II gaming." *Id.* § 2703(8). This includes the "types of high-stakes games usually associated with Nevada-style gambling" such as "blackjack, baccarat, slot machines, and parimutuel horse-wagering." *Chicken Ranch Rancheria of Me-Wuk Indians v. California.*, 42 F.4th 1024, 1032 (9th Cir. 2022) (internal citation omitted).

This case concerns gaming on land taken into trust by the Secretary of the Interior ("Secretary") under the Indian Reorganization Act ("IRA") "'for the purpose of providing land for Indians.'" *Cachil Dehe Band of Wintun Indians of Colusa Indian Cmty. v. Zinke*, 889 F.3d 584, 594 (9th Cir. 2018) (quoting 25 U.S.C. § 5108). As discussed below, the Secretary took the North Fork land at issue here into trust in 2013.

In general, gaming is prohibited "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." 25 U.S.C. § 2719(a). An exception to this restriction applies when the Secretary determines (1) "that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members," and (2) "would not be detrimental to the surrounding community." *Id.* § 2719(b)(1)(A). This is often referred to as the "two-part determination." *See, e.g.*, *Kalispel Tribe of Indians v. U.S. Dep't of the Interior*, 999 F.3d 683, 688 (9th Cir. 2021). The exception requires that the governor of the state in which gaming activity is to be conducted concur in the Secretary's determination. 25 U.S.C. § 2719(b)(1)(A).[1]

---

[1] Section 2719(a) states that, save for certain situations not relevant to this case: "Except as provided in subsection (b), gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988." 25 U.S.C. § 2719(a). The exception at section 2719(b)(1) provides, in relevant part:

> Subsection (a) will not apply when—(A) the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.

IGRA imposes specific restrictions on class III gaming, including that such gaming activities be "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State." *Id.* § 2710(d)(1)(C). Tribal-state compacts govern gaming and may have provisions concerning issues including the application of criminal and civil laws and taxation. *Id.* § 2710(d)(3)(C). As discussed below, when a tribe and state cannot agree on a compact, class III gaming may also be conducted pursuant to procedures issued by the Secretary. Indian tribes can manage class III gaming themselves or contract out the management of such gaming to non-tribal entities. *See* 25 C.F.R. § 502.15. If an Indian tribe wishes to enter into a management contract "for the operation of a class III gaming activity," that contract must be "submitted to, and approved by" the Chair of the NIGC. *Id.* § 2710(d)(9); *see also id.* § 2705(a)(4).

IGRA provides that district courts shall have jurisdiction over "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . that is in effect." *Id.* § 2710(d)(7)(A)(ii). It additionally provides that district courts shall have jurisdiction over "any cause of action initiated by the Secretary to enforce" secretarial procedures. *Id.* § 2710(d)(7)(A)(iii).

**B. <u>Proceedings Regarding Gaming on the Madera Parcel</u>**

North Fork has sought to develop the North Fork Mono Casino & Resort ("North Fork Casino"), at which it plans to offer class III gaming. FAC at ¶¶ 8, 29, 45. In March 2005, North Fork submitted an application to the Bureau of Indian Affairs within the Department of the Interior, requesting that the Secretary take into trust a 305-acre parcel in Madera County ("Madera Parcel") for North Fork's benefit. *Id.* at ¶ 8; North Fork's MTD at 13. In 2011, pursuant to § 2719(b)(1)(A), the Secretary issued a two-part determination, finding that gaming on the Madera Parcel would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community. FAC at ¶ 47; North Fork's MTD at 13; Doc. 42-1 at 2. In August 2012, California Governor Edmund G. Brown ("Governor") issued a letter to the Secretary stating his concurrence. FAC at ¶ 48; Doc. 34-2 at 444–45; North Fork's

---

*Id.* § 2719(b)(1).

MTD at 13. The Governor's concurrence was required under 25 U.S.C. § 2719(b)(1)(A), because the Madera Parcel was taken into trust after IGRA's 1988 enactment. *See id.* § 2719(a), (b)(1)(A). The Governor also stated his approval of a tribal-state compact with North Fork, as required for class III gaming by § 2710(d)(1)(C). FAC at ¶ 48.

On November 26, 2012, the Secretary issued a record of decision that approved North Fork's application for the Secretary to take the Madera Parcel into trust. *See* Joint Appendix at 1611–79, *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212 (D.D.C. 2016) (No. 12-2039). The Secretary announced the decision to acquire the Madera Parcel by publishing a notice in the *Federal Register* on December 3, 2012. *See* Land Acquisitions; North Fork Rancheria of Mono Indians of California, 77 Fed. Reg. 71,611 (Dec. 3, 2012). This decision was implemented in February 2013, when the Secretary accepted a grant deed conveying the Madera Parcel and the deed was recorded in Madera County. *Stand Up for California! v. State*, 64 Cal. App. 5th 197, 203 (Cal. Ct. App. 2021); *see* FAC at ¶ 53.

This did not end the matter. Under the California Constitution, the legislature must ratify compacts. Cal. Const. art. IV, § 19(f). Though the California legislature passed Assembly Bill No. 277 to ratify the compact, and the Governor signed this bill on July 3, 2013, the ratification statute was quickly challenged by state referendum. *Stand Up*, 64 Cal. App. 5th at 203–05. The measure was designated Proposition 48 and was submitted to the electorate in November 2014. *Id.* at 205. In the election, 61% voted "No" on Proposition 48, "thereby rejecting the ratification statute." *Id.* at 205; *see* FAC at ¶ 49.

California then refused to negotiate a new compact with North Fork. *Stand Up*, 64 Cal. App. 5th at 205; North Fork's MTD at 13. North Fork filed an action in this district to compel the state to negotiate a new compact.[2] *Stand Up*, 64 Cal. App. 5th at 205. Though the district court

---

[2] Under IGRA, if a tribe sues a state for failure to enter into negotiations, and the court finds the state failed to negotiate in good faith with the Indian tribe, "the court shall order the State and the Indian Tribe to conclude . . . a compact within a 60-day period." 25 U.S.C. § 2710(d)(7)(B)(iii). If no agreement is reached after 60 days, the court must order the parties to each "submit to a mediator appointed by the court a proposed compact that represents their last best offer for a compact." *Id.* § 2710(d)(7)(B)(iv). "The mediator . . . select[s] from the two proposed compacts the one which best comports" with IGRA and other applicable federal laws. *Id.* If the state does

granted North Fork's request and ordered North Fork and the State to conclude a compact within 60 days, no compact was reached. *Id.* The subsequent mediation also did not result in a compact. *Id.* Thus, in July 2016, the Secretary issued procedures for the purpose of authorizing class III gaming on the Madera Parcel ("Secretarial Procedures"). *Id.* at 205–06; FAC at ¶ 51. Relevant here, the Secretarial Procedures for North Fork provide:

> Sec. 4.2. Authorized Gaming Facility.
>
> The Tribe may establish and operate not more than two (2) Gaming Facilities and engage in Class III Gaming only on eligible Indian lands held in trust for the Tribe, located within the boundaries of the Madera Parcel, as those boundaries exist as of the execution date of these Secretarial Procedures, as legally described in and represented on the map at Appendix A, and on which Class III Gaming may lawfully be conducted under IGRA.

Doc. 34-2 at 261.

In or around November 2023, North Fork and at least one of the Nominal Defendants executed a management contract under which at least one of the Nominal Defendants "committed to assisting North Fork . . . in operating" gaming activity on the Madera Parcel. FAC at ¶ 56. The Chair approved the management contract in January 2024. *Id.* at ¶ 5; Picayune's Mot. at 15.

**C. <u>Prior Federal Litigation</u>**

In *Stand Up for California! v. United States Department of the Interior*, 204 F. Supp. 3d 212 (D.D.C. 2016), Picayune, along with others, sued entities including the Department of the Interior, the Secretary, and North Fork. *Id.* at 226. Among other things, Picayune challenged, as arbitrary and capricious under the Administrative Procedure Act ("APA"), the Secretary's decision to take the Madera Parcel into trust and the Secretary's two-part determination under IGRA § 2719(b)(1)(A). *See id.* at 247, 257. Picayune specifically challenged the Secretary's determination, pursuant to § 2719(b), that North Fork's proposed casino would not be detrimental to the surrounding community. *Id.* at 261–76. Picayune also argued that because the decision to take the Madera Parcel into trust "rests on the notion that the property was, in fact, authorized for

---

not consent to this compact, then the Secretary, "in consultation with the Indian tribe," prescribes procedures "which are consistent with the proposed compact selected by the mediator," IGRA, and relevant provisions of state law, and "under which class III gaming may be conducted on the Indian lands over which the Indian tribe has jurisdiction." *Id.* § 2710(d)(7)(B)(vii).

tribal gaming under IGRA," the decision was "without a basis." *Id.* at 277 (internal citation omitted). Picayune also asserted in that case that the Secretary erred "by relying on a purported concurrence from the Governor of California that is ultra vires and invalid under California law." *Id.* at 247 n.16 (internal citation omitted).

The district court granted summary judgment in favor of defendants, finding that the Secretary's conclusions were properly based upon evidence in the record. *Id.* at 257–76. The court also rejected Picayune's challenge to the Secretary's decision to take the Madera Parcel into trust. *Id.* at 277, 302. With respect to Picayune's allegation regarding the Governor's concurrence, the court noted that Picayune did not "mention its allegations regarding the Governor's concurrence" in its summary judgment briefing, and the court therefore "deemed [the claim] abandoned in this case." *Id.* The court also noted that the claim that the Secretary erred by relying on the Governor's concurrence letter would fail because California was an indispensable party that could not be joined. *Id.*[3]

The D.C. Circuit upheld the district court's decision on appeal. *See Stand Up for California! v. U.S. Dep't of Interior*, 879 F.3d 1177, 1179 (D.C. Cir. 2018). With respect to Picayune's challenge to the Governor's concurrence, the D.C. Circuit found:

> [This argument] is twice forfeited. The district court concluded that the Picayune, having "nowhere in its ample briefing on summary judgment even mentioned" the gubernatorial concurrence's supposed invalidity, abandoned any challenge to the concurrence. *Stand Up for California!*, 204 F. Supp. 3d at 247 n.16. The district court further ruled that no such challenge could proceed in any event, as California was not a party. *See id.* at 254. Because the Picayune challenged neither of these independently dispositive findings in its opening brief, it has forfeited its opportunity to do so.

*Stand Up*, 879 F.3d at 1186.

///

///

[3] Picayune likewise challenged the validity of the Governor's concurrence in a separate suit in this district. *See Picayune Rancheria of Chukchansi Indians v. U.S. Dep't of Interior*, No. 1:16-CV-0950-AWI-EPG, 2017 WL 3581735, at *1 (E.D. Cal. Aug. 18, 2017). The district court found that Picayune was precluded from re-litigating the issue of whether California was an indispensable party and found for the Department of the Interior. *Id.* at *7–10.

**D. <u>State Court Decisions</u>**

A series of California state court cases concerning the validity of the Governor's concurrence also ensued. In *United Auburn Indian Community of Auburn Rancheria v. Newsom*, the California Supreme Court explained that, although "nowhere in the California Constitution is the Governor granted explicit authority to concur" in IGRA's "cooperative-federalism scheme . . . California law empowers the Governor to concur." 10 Cal. 5th 538, 543 (2020). This "power, however, [is not] an indefeasible one." *Id.* at 563. "[T]he legislative branch is capable of enacting legislation that would reduce the Governor's concurrence power." *Id.*

In *Stand Up for California! v. State of California*, the California Court of Appeal concluded in 2021 that, in rejecting Proposition 48, the people of California exercised their constitutional power to annul the Governor's 2012 concurrence. 64 Cal. App. 5th at 210–17; FAC at ¶ 53. Based on its interpretation of the California Constitution, the court concluded that "the people of California retained the authority to annul a concurrence in the Interior Secretary's two-part determination after it has been issued by the Governor." *Stand Up*, 64 Cal. App. 5th at 212. It found that "the Governor's exercise of the defeasible concurrence power is itself an act capable of being undone by the people." *Id.* The court further concluded that "a referendum is an appropriate mechanism for annulling a Governor's concurrence in the Interior Secretary's two-part determination," *id.* at 214, and that the voters' rejection of Proposition 48 in 2014 "impliedly expressed their will to annul the Governor's August 30, 2012 concurrence for the Madera Site." *Id.* at 216. The California Supreme Court denied review on September 1, 2021.

Then, in 2025, in *Picayune Rancheria of Chukchansi Indians v. North Fork Rancheria of Mono Indians*, the California Court of Appeal held as a matter of California constitutional law that the peoples' "retained power to annul [a governor's concurrence] includes the power to render the concurrence void ab initio." 117 Cal. App. 5th 91, 113 (Cal. Ct. App. 2025). The court concluded that the "voter's rejection of Proposition 48 included an implied annulment of the Governor's concurrence that rendered the concurrence void ab initio." *Id.* at 114. The California Supreme Court denied review on April 1, 2026.

///

### E. The Present Litigation[4]

On June 5, 2026, Picayune brought this suit against North Fork, the NIGC, its Chair, and the Nominal Defendants, asserting a violation of the APA, and asserting a cause of action under IGRA against North Fork. Doc. 1 at ¶¶ 54–76. After the Nominal Defendants and North Fork moved to dismiss, Docs. 21, 26, Picayune filed the First Amendment Complaint on August 20, 2026. *See* FAC.

#### 1. The First Amended Complaint

Picayune asserts two claims in its First Amended Complaint: (1) the Chair's approval of the management contract between North Fork and the Nominal Defendants violated the APA, and (2) North Fork's intended class III gaming on the Madera Parcel violates North Fork's Secretarial Procedures. *See* FAC at ¶¶ 62–89. Picayune alleges that North Fork intends to open its casino in the fall of 2026. FAC at ¶ 34. A further filing asserts that the casino's scheduled opening date is October 28, 2026. Doc. 63 at 2. Picayune alleges that at least one of the Nominal Defendants is a party to a management contract with North Fork, that the Chair approved the contract in 2024, and that the Nominal Defendants "are acting in concert with each other and operating, in effect, as a single integrated business enterprise, alter ego, and/or principal and agent of one another with respect to the development and operation of the North Fork Project." *Id.* at ¶¶ 5, 13–14.

Picayune asserts that the Chair's decision to approve the management contract violated the APA because the Chair may approve management contracts only when the gaming covered by the contract complies with IGRA, and gaming on the Madera Parcel does not comply with IGRA because the Governor's concurrence was void ab initio. FAC at ¶¶ 62–72. Additionally, Picayune argues that the Chair's approval violated the APA because the Chair approved the management contract even though gaming on the Madera Parcel violates the Johnson Act. *Id.* at ¶¶ 73–74. The Johnson Act prohibits transporting, possessing, or using any gambling device on Indian country. 15 U.S.C. § 1175(a). IGRA provides an exception to the Johnson Act for IGRA

---

[4] Much of the following discussion of the facts is drawn from Picayune's amended complaint. In considering Picayune's motion for a preliminary injunction and stay, the court also considers and references other materials submitted by the parties.

compliant gaming. *See* § 2710(d)(6). But Picayune contends that gaming on the Madera Parcel is not compliant with IGRA as the Governor never issued a valid concurrence, and that the Madera Parcel therefore does not qualify for the § 2719(b)(1)(A) exception. FAC at ¶¶ 73–74.

Picayune's second claim, asserted against North Fork, is based on IGRA § 2710(d)(7)(A)(ii), which, Picayune argues, allows it to sue North Fork to enjoin class III gaming activity in violation of North Fork's Secretarial Procedures. *Id.* at ¶¶ 75–89. Picayune argues that North Fork's planned gaming activity violates the Secretarial Procedures, which, it alleges, authorize North Fork to "engage in Class III Gaming only on eligible Indian lands" and only if the "Class III Gaming may lawfully be conducted under IGRA." Doc. 34-2 at 261; FAC at ¶ 78. Picayune asserts that, as there is no valid concurrence from the Governor, class III gaming may not lawfully be conducted under IGRA on the Madera Parcel. FAC at ¶¶ 75–83.

Picayune alleges that gaming at the North Fork Casino will cause harm to Picayune and its members. Picayune alleges that the Madera Parcel, on which the North Fork Casino is located, is near Highway 99, a heavily trafficked highway that runs through the major cities of California's Central Valley. *Id.* at ¶ 45. It is approximately 39 miles from Picayune's Chukchansi Gold Resort and Casino. *Id.* Picayune alleges that "[t]he fastest and most direct route to Picayune's Casino is via State Route 99 and then State Route 44, a smaller, less trafficked highway." *Id.* at ¶ 46.

**2. Picayune's Motion for a Preliminary Injunction and Stay**

Picayune moves to preliminarily enjoin class III gaming activity on the Madera Parcel, and to stay, under the APA, the Chair's decision to approve the management contract. Picayune's Mot. at 16–19. In support of its motion, Picayune submitted evidence including declarations by tribe members concerning harm Picayune will suffer due to the North Fork Casino. *See generally* Doc. 34-3; Doc. 34-4; Doc. 34-5; Doc. 34-6; Doc. 34-7; Doc. 34-8. Tribe members allege that Picayune "estimates" that the North Fork Casino will cause Picayune to lose 30% to 50% of its gaming revenue, but they did not provide supporting analysis with the motion. *See* Doc. 34-3 at ¶ 12; Doc. 34-4 at ¶ 5; Doc. 34-8 at ¶ 15. Tribe members additionally allege that this loss of gaming revenue will harm the tribe and its members by, among other things, reducing

government services and undermining cultural preservation efforts. *See* Doc. 34-3 at ¶¶ 13–15; Doc. 34-4 at ¶¶ 6–7; Doc. 34-7 at ¶ 13; Doc. 34-8 at ¶¶ 16–17. One declaration by a tribe member referenced an "independent third-party" analysis that showed that North Fork's Casino "would result in a decline of somewhere between 30% and 50% of the gaming revenue of the Chukchansi Casino." Doc. 34-6 at ¶ 10. But Picayune did not submit this analysis with its initial motion filings.[5]

North Fork, the Nominal Defendants, and the Federal Defendants oppose the motion for a preliminary injunction and stay. All defendants argue that the Chair was not required to review the eligibility of the Madera Parcel for gaming under § 2719(b)(1)(A) when he approved the management contract. North Fork's Opp. at 16; Nominal Defs.' Opp. at 11–12; Fed. Defs.' Opp. at 8–13. In its opposition, North Fork submitted a November 22, 2021 letter it wrote to the NIGC seeking clarity on the Madera Parcel's gaming eligibility, as well as a March 22, 2022 response from the NIGC general counsel concluding that the Madera Parcel qualifies for gaming. Doc. 43-2 at 12, 19. The Nominal Defendants additionally argue that Picayune lacks standing for its APA claim. Nominal Defs.' Opp. at 10–11. North Fork and the Nominal Defendants also invoke their motion to dismiss arguments, discussed below, against the motion for preliminary injunction. North Fork's Opp. at 15–16; Nominal Defs.' Opp. at 11–13.

Defendants also argue that Picayune does not show a likelihood of irreparable harm, and they argue that the balance of equities and the public interest do not favor an injunction or stay. Fed. Defs.' Opp. at 13–16; Nominal Defs.' Opp. at 13–21; North Forks's Opp. at 19–30. North Fork submitted a declaration of a North Fork tribe member describing the efforts to provide class III gaming on the Madera Parcel and the alleged harm that will result to North Fork from an injunction. *See* Doc. 43-1 at ¶¶ 1–34. The tribe member alleges that North Fork has, in connection with opening its casino, paid the City of Madera $293,728. *Id.* at ¶ 14. During the first year of casino operations, North Fork additionally plans to make a recurring payment of

---

[5] Picayune also submitted materials including a copy of the North Fork tribal-state gaming compact, the Secretarial Procedures, and a news release about the management contract. Doc. 34-2 at 2. It additionally submitted a map that shows the location of the Madera Parcel in relation to Highway 99. Doc. 34-2 at 357.

$840,000 to the City of Madera. *Id.* $2,065,000 is also due to the County of Madera in the first year of casino operations. *Id.* The tribe member alleges that, as of August 31, 2026, the tribe's debt obligations exceed $600 million, "which is subject to a blended interest rate of approximately 10.5%, and which accrues approximately $173,000 in interest every day." *Id.* at ¶ 28. The tribe member further alleges that "[o]ver 1,222 employees have been hired to support casino operations to date." *Id.* at ¶ 33. The tribe representative indicates that a preliminary injunction would bankrupt the tribe, produce "a debt burden which could never be overcome," would result in the loss of employment to the vast majority of people North Fork anticipates having on payroll at the casino, and would cause the breach of contracts with dozens of food and equipment vendors and the breach of restaurant tenant leases. *Id.*

**3. Motions to Dismiss**

The Nominal Defendants and North Fork move to dismiss for failure to state a claim under rule 12(b)(6). The Nominal Defendants argue that Picayune's APA claim should be dismissed for failure to state a claim as the Chair was not required to review gaming eligibility on the Madera Parcel under § 2719(b)(1)(A) before approving a management contract. Nominal Defs.' MTD at 14–17. The Nominal Defendants also argue that the IGRA cause of action that Picayune invokes authorizes only suits to enjoin gaming conduct in violation of tribal-state compacts, not, as at issue here, tribal gaming allegedly in violation of the tribe's secretarial procedures. *Id.* at 17–22. They also argue the IGRA claim is time barred. *Id.* at 22–26.

North Fork similarly argues that Picayune's suit should be dismissed for failure to state a claim as the Chair had no authority to review gaming eligibility of the Madera Parcel under § 2719(b)(1)(A) when approving the management contract, and IGRA does not provide a cause of action for Picayune's suit, which is based on an alleged violation of North Fork's Secretarial Procedures. North Fork's MTD at 24. It further argues that Picayune does not state a claim upon which relief can be granted as this suit is an improper collateral attack on previous decisions by the Secretary, and principles of federalism and administrative law preclude relief. *Id.*

North Fork also moves for dismissal under Federal Rules 19 and 12(b)(7). *Id.* at 17. It argues that IGRA has not abrogated North Fork's sovereign immunity from this suit. *Id.* at 17–

18. Because North Fork is a required party, but cannot be joined because of sovereign immunity, this case must be dismissed. *Id.* at 17–23. North Fork argues Rule 19 also requires dismissal due to the Secretary's absence. *Id.* at 23–24.

The Federal Defendants did not move to dismiss. They filed an Answer denying that their actions violated IGRA and the APA. Doc. 41 at ¶ 6.[6]

Picayune filed oppositions to both motions to dismiss, as well as an omnibus reply in support of its motion for a preliminary injunction and stay. *See* Docs. 45–47. With its reply, Picayune submitted a tribal resolution, adopted on September 17, 2026, concerning Picayune's budgetary response to the North Fork Casino. Doc. 47-2 at 5–6. Picayune also submitted a third-party study from 2019, analyzing the anticipated impact on Picayune of North Fork's planned casino as of 2019. Doc. 47-2 at 17. The 2019 study asserted that North Fork's Casino would cause Picayune to lose about 40% of its gaming revenue. *Id.* at 20. Picayune included with this submission a brief statement claiming that this 2019 study remains "representative" of the impact of the North Fork Casino on Picayune today. *Id.* at 48.

North Fork and the Nominal Defendants filed replies in support of their motions to dismiss. Docs. 50, 51. They additionally filed objections to Picayune's inclusion of new exhibits in its reply brief. Docs. 52, 53. The court granted defendants leave to file sur-replies. Doc. 54. North Fork and the Nominal Defendants subsequently filed sur-replies arguing that Picayune's newly submitted materials do not support a finding of irreparable harm. Docs. 55, 56.

The court held a hearing on the motions to dismiss and the motion for a preliminary injunction and stay on October 9, 2026.

///

///

---

[6] The Federal Defendants also filed a separate response to North Fork's motion to dismiss, addressing North Fork's argument that the case should be dismissed because North Fork is a required party that cannot be joined. Doc. 44. The Federal Defendants "do not dispute that North Fork's motion to dismiss the APA claim pled against NIGC should be granted under the current state of the law." *Id.* at 8. But they note that "they reserve the right to assert in future proceedings that the United States is generally the only required and indispensable defendant in APA litigation challenging federal agency action." *Id.* at 8.

## II. LEGAL STANDARD

### A. Dismissal for Failure to Join a Party Under Rule 19

Federal Rule of Civil Procedure 19 "governs compulsory party joinder in federal district courts." *EEOC v. Peabody W. Coal Co.*, 610 F.3d 1070, 1077 (9th Cir. 2010). Under this rule, a person is necessary when (1) "in his absence, the court cannot accord complete relief among existing parties," (2) when "he has an interest in the action and resolving the action in his absence may as a practical matter impair or impede his ability to protect that interest," or (3) when a person "has an interest in the action and resolving the action in his absence may leave an existing party subject to inconsistent obligations because of that interest." *Salt River Project Agr. Imp. & Power Dist. v. Lee*, 672 F.3d 1176, 1179 (9th Cir. 2012); Fed. R. Civ. P. 19(a). If a person required to be joined if feasible "cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). A party may move to dismiss for failure to join a party under Rule 19. Fed. R. Civ. P. 12(b)(7).

### B. Dismissal for Failure to State a Claim

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss an action for failure to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation omitted). When ruling on a Rule 12(b)(6) motion, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). The court may also "take judicial notice of matters of public record outside the pleadings." *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986).

///

**C. <u>Preliminary Injunction and Stay</u>**

"A preliminary injunction is an extraordinary and drastic remedy" that "is never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal citation omitted). "A party seeking a preliminary injunction must meet one of two variants of the same standard." *All. for the Wild Rockies v. Pena*, 865 F.3d 1211, 1217 (9th Cir. 2017). Under the "original" variant, "a party must show 'that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Under the "sliding scale" scale variant "if a plaintiff can only show that there are serious questions going to the merits—a lesser showing than likelihood of success on the merits—then a preliminary injunction may still issue if the balance of hardships tips *sharply* in the plaintiff's favor, and the other two . . . factors are satisfied." *Id.* (emphasis in original) (internal citation omitted). "Serious questions are ones that cannot be resolved one way or the other at the hearing on the injunction because they require more deliberative investigation." *Flathead-Lolo-Bitterroot Citizen Task Force v. Montana*, 98 F.4th 1180, 1192 (9th Cir. 2024) (internal citation omitted). "They need not promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Id.* (internal citation omitted).

A stay of agency action under 5 U.S.C. § 705 differs from a preliminary injunction as, "[w]hereas an injunction tells someone what to do or not to do, a . . . stay only reinstates the status quo absent the unlawful agency action and neither compels nor restrains further agency decision-making." *Immigrant Defs. Law Ctr. v. Noem*, 781 F. Supp. 3d 1011, 1042 (C.D. Cal. 2025) (internal citation omitted). A stay "of agency action under the APA is governed by the preliminary injunction factors." *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1015 (9th Cir. 2025).

## III. DISCUSSION

As there is overlap between the arguments made on the motions to dismiss and on the oppositions to Picayune's motion for preliminary injunction and stay, the court will address certain of the arguments together, differentiating where necessary between the standards on a

motion to dismiss and on a preliminary injunction. For the reasons discussed below, Picayune has not shown a likelihood of success on the merits. Nor has Picayune shown a likelihood of irreparable harm, or that the balance of the equities and the public interest favor it. Additionally, the court grants the Nominal Defendants' and North Fork's motions to dismiss the APA claim. The court also dismisses the IGRA claim, which Picayune brings solely against North Fork, based on North Fork's sovereign immunity.

**A. <u>Standing for the APA Claim</u>**

The Nominal Defendants argue that Picayune lacks standing for its APA claim. Nominal Defs.' Opp. at 10. The Nominal Defendants raised this issue only in their opposition to Picayune's motion for a preliminary injunction, and not in their motion to dismiss. The court is "required sua sponte to examine jurisdictional issues such as standing." *B.C. v. Plumas Unified Sch. Dist.*, 192 F.3d 1260, 1264 (9th Cir. 1999).

"'Those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1067 (9th Cir. 2011) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983)). Without standing, no case or controversy exists, and the court therefore lacks subject matter jurisdiction. *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004). "[A] plaintiff must demonstrate standing for each claim he seeks to press." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (internal citation omitted). Standing requires showing an (i) "injury in fact" that is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical," (ii) that there is "a causal connection between the injury and the conduct complained of", and (iii) that it is "likely as opposed to merely speculative that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal citation omitted).

"The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561. "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3); *Bernhardt v. Cnty. of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2002) (internal citation omitted). The party that bears the burden of supporting

standing must provide "the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. "At the motion to dismiss stage, the bar to allege standing is not high." *Powers v. McDonough*, 713 F. Supp. 3d 695, 728 (C.D. Cal. 2023). Courts "'must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party.'" *Maya*, 658 F.3d at 1068 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

Picayune satisfies its burden to establish standing on its APA claim. Picayune has adequately alleged in the First Amended Complaint that the management contract and planned gaming activity are likely to cause Picayune injury. It alleges that North Fork plans to open its casino this fall. FAC at ¶ 34. Pursuant to the management contract, the Nominal Defendants are to run day-to-day operations. *Id.* at ¶ 5. Picayune alleges that the North Fork Casino will compete with Picayune's casino, resulting in less revenue for Picayune over time. FAC at ¶¶ 25, 28. Picayune has also established redressability: If the management contract is set aside, North Fork will likely provide less gaming and may well be unable to provide gaming at all, and Picayune asserts it would therefore face less competition. *See id.* at ¶¶ 28–30.

For purposes of its motion for a preliminary injunction, Picayune is required to "'make a clear showing that [it] is likely to establish each element of standing.'" *Am. Encore v. Fontes*, 152 F.4th 1097, 1110 (9th Cir. 2025) (quoting *Murthy v. Missouri*, 603 U.S. 43, 58 (2024)). For the reasons discussed above, Picayune has shown that it is likely to establish standing with respect to its APA claim.[7]

**B. <u>Rule 19 Does Not Require Dismissal for Failure to Join the Secretary</u>**

North Fork argues that Picayune's failure to join the Secretary requires dismissal under Rules 19 and 12(b)(7) because the Secretary is a necessary party. North Fork's MTD at 23–24. North Forks points to the District of Columbia litigation in which the district court determined that California was a necessary party to the lawsuit when the plaintiffs challenged the validity of

---

[7] However, as addressed below, Picayune has not established a likelihood of success on the merits, that it will suffer irreparable harm, or that the balance of hardships and public interest weighs in Picayune's favor.

the Governor's concurrence. *Stand Up*, 204 F. Supp. 3d at 250. The court determined that "California unquestionably has an interest in its Governor's authority, under its own law, to comply with federal law." *Id.* at 253. North Fork argues that, "[j]ust as California unquestionably had an interest in the continuing validity of the concurrence so too does the Secretary have an interest in the continuing validity of the Secretarial Procedures." North Fork's MTD at 24 (internal quotations omitted). The Federal Defendants do not join in North Fork's argument that the Secretary is an indispensable party. *See* Fed. Defs.' Opp. at 8–13.

North Fork's premise is incorrect. Picayune does not, as North Fork contends, "seek to nullify [the Secretarial Procedures] in the Secretary's absence." North Fork's MTD at 24. It does not seek to nullify them at all. Here, Picayune does not directly challenge any act of the Secretary. *See* FAC at ¶¶ 62–89. Rather, Picayune essentially asserts, in its IGRA claim, that it seeks to enforce North Fork's Secretarial Procedures against North Fork. North Fork's argument based on Rule 12(b)(7) and Rule 19 with respect to the Secretary is denied.

**C. <u>Collateral Attack on the Secretary's Prior Decisions</u>**

North Fork also moves to dismiss on the ground that Picayune's suit "is plainly a collateral attack on the Secretary's 2012 decision to take the Madera Site into trust as gaming-eligible land, and on the Secretary's 2016 issuance of Secretarial Procedures to authorize class III gaming at the site." North Fork's MTD at 25. North Fork cites the Ninth Circuit's decision in *Big Lagoon Rancheria v. California*, in which the Ninth Circuit rejected a challenge to the Bureau of Indian Affairs' decision to take land into trust for an Indian tribe. 789 F.3d 947, 948, 952–54 (9th Cir. 2015). *Big Lagoon* notes that a decision to take land into trust is "a garden-variety APA claim," and "parties cannot 'use a collateral proceeding to end-run the procedural requirements governing appeals of administrative decisions.'" *Id.* at 953 (quoting *United States v. Backlund*, 689 F.3d 986, 1000 (9th Cir. 2012)). Allowing such collateral attacks "would effectively circumvent the six-year statute of limitations [that] governs review of such actions." *Id.* (internal citation omitted).

As Picayune points out in its opposition to North Fork's motion to dismiss, Picayune challenges neither the decision to take the Madera Parcel into trust nor the Secretarial Procedures.

Doc. 46 at 22. It challenges the Chair's 2024 approval of the management contract, and North Fork's alleged violation of the Secretarial Procedures based upon its planned class III gaming on the Madera Parcel. FAC at ¶¶ 62–89.

Neither claim purports to invalidate either the Secretary's decision to take the Madera Parcel into trust or the Secretarial Procedures. On its APA claim, Picayune argues that the Chair's approval of the management contract was arbitrary and capricious, an abuse of discretion, or otherwise contrary to law because the Chair approved the management contract even though the Governor's concurrence was void ab initio. FAC at ¶ 69–72. Picayune's claim is based on its argument that, notwithstanding any prior actions by the Secretary—including the Secretary's issuance of the two-part determination and receipt of the Governor's concurrence letter in 2012, the Secretary's placing of the Madera Parcel into trust in 2013, and the Secretary's issuance of the Secretarial Procedures in 2016—the Chair had an independent duty to review the validity of the Governor's concurrence for purposes of § 2719(b)(1)(A) before the Chair approved North Fork's management contract in 2024.

As for Picayune's argument that North Fork's planned class III gaming violates the Secretarial Procedures, this argument too is based on the invalidity of the Governor's concurrence, not the invalidity of the Secretarial Procedures. Picayune argues that the Secretarial Procedures provide that North Fork may "engage in Class III Gaming only on eligible Indian lands in trust for the Tribe, located within the boundaries of the Madera Parcel" and only on lands "on which Class III Gaming may lawfully be conducted under IGRA." Doc. 34-2 at 261. Picayune asserts that gaming cannot be lawfully conducted on the Madera Parcel under IGRA because the Governor's concurrence is invalid. FAC at ¶¶ 80–85. Rather than challenging the Secretarial Procedures, Picayune's IGRA claim is that class III gaming will violate those procedures.

**D. <u>Picayune's APA Claim</u>**

Picayune contends that the NIGC Chair's approval of the management contract violated the APA because, under IGRA, the Chair "may approve a management contract only if all gaming covered by the contract will be conducted in accordance with IGRA." FAC at ¶ 71. And,

Picayune asserts, there was never a valid concurrence from the Governor, so gaming on the Madera Parcel would not be conducted in accordance with IGRA. FAC at ¶¶ 64–72. Therefore, it alleges, the Chair's approval of the management contract was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law under 5 U.S.C. § 706(2)(A). *Id.* at ¶¶ 64, 72. The Chair's approval also violated the APA, Picayune argues, because the Chair approved the management contract even though gaming on the Madera Parcel would violate the Johnson Act's prohibition on IGRA non-compliant gaming. *Id.* at ¶¶ 73–74.

North Fork argues that IGRA does not authorize the Chair to reconsider the eligibility under § 2719(b)(1)(A) of the Madera Parcel for gaming. North Fork's MTD at 27; North Fork's Opp. at 16. Similarly, the Nominal Defendants and the Federal Defendants argue that reconsideration of such gaming eligibility is not a prerequisite for management contract approval under IGRA. Nominal Defs.' MTD at 14; Nominal Defs.' Opp. at 11–12; Fed. Defs.' Opp. at 9.

As addressed below, the court finds that the Chair was not required to review the validity of the Governor's concurrence, or the eligibility of the Madera Parcel for gaming under § 2719(b)(1)(A), prior to approving the management contract. As that legal theory is the basis for Picayune's claim, Picayune fails to show a likelihood of success on its claim that the Chair's approval of the management contract was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.

**1. Authority to Review and Stay Agency Action**

The APA provides "'the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 16 (2020) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 796 (1992)). It requires courts to "hold unlawful and set aside agency action, findings, and conclusions," that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

The Chair's approval of the management contract is reviewable. "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. The Chair's approval of a management

contracts is a "final agency" decision "for purposes of appeal to the appropriate Federal District court" pursuant to the APA. 25 U.S.C. § 2714.[8]

### 2. IGRA's Requirements for Management Contracts

Notwithstanding the D.C. Circuit's finding in 2018 that Picayune had forfeited its challenge to the validity of the Governor's concurrence, *see Stand Up*, 879 F.3d at 1186, Picayune argues that the Chair was required in 2024 to review the validity of the Governor's concurrence, and whether § 2719(b)(1)(A)'s exception applied, when approving the management contract. The text of IGRA and its implementing regulations do not support Picayune's position.

Section 2710(d)(9) provides:

> An Indian tribe may enter into a management contract for the operation of a class III gaming activity if such contract has been submitted to, and approved by, the Chairman. *The Chairman's review and approval of such contract shall be governed by the provisions of subsections (b), (c), (d), (f), (g), and (h) of section 2711 of this title.*

25 U.S.C. § 2710(d)(9) (emphasis added). Nowhere in these subsections of § 2711 did Congress require the Chair to review the validity of a Governor's concurrence under § 2719(b)(1)(A).

Section 2711(b) provides that "[t]he Chairman may approve any management contract . . . only if he determines that it provides at least" for (1) "adequate accounting procedures that are maintained, and for verifiable financial reports that are prepared, by or for the tribal governing body on a monthly basis"; (2) tribal officials' right to access gaming operations and to verify revenues and income from gaming activity; (3) "a minimum guaranteed payment to the Indian tribe that has a preference over the retirement of development and construction costs"; (4) "an agreed ceiling for the repayment of development and construction costs"; (5) a contract

---

[8] A court may also stay the Chair's action even though it already occurred. Unlike an agency, which may only "postpone the effective date of action taken by it," courts may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. The "status quo to be restored is the last peaceable uncontested status existing between the parties *before* the dispute developed." *Nat'l TPS All. v. Noem*, 773 F. Supp. 3d 807, 835 (N.D. Cal. 2025) (internal citation omitted); *African Communities Together v. Lyons*, 799 F. Supp. 3d 362, 383 (S.D.N.Y. 2025) (explaining that the "argument that the Court cannot enter a section 705 stay after an agency action has already taken effect does not have merit").

term that, depending on the conditions, may be up to either five or seven years; and (6) "grounds and mechanisms for terminating" the contract. 25 U.S.C. § 2711(b).

Section 2711 goes on to provide requirements concerning certain fees (§ 2711(c)); the time period within which the Chair must approve or disapprove the contract (§ 2711(d)); and when the Chair is authorized to require contract modification or to void a contract (§ 2711(f)). Finally, § 2711 provides that "[n]o management contract . . . shall transfer or . . . convey any interest in land or other real property, unless specific statutory authority exists" and that the Secretary's authority's "relating to management contracts regulated pursuant to this chapter, is . . . transferred" to the NIGC. *Id.* § 2711(g)–(h). There is no requirement that the Chair review a governor's concurrence for compliance with § 2719(b)(1)(A). *See also Wells Fargo Bank, Nat'l Ass'n v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 688 (7th Cir. 2011) (explaining standards for the Chair's review of management contracts).

Nor do the regulations support Picayune's argument.[9] 25 C.F.R. § 533.6 allows the Chair to "approve a management contract if it meets the standards of" sections 531 and 533.3. Section 533.3 lists out requirements for what "[a] tribe shall include in any request for approval of a management contract," and does not require the Chair to review a governor's concurrence. *See id.* § 533.3. Section 531.1 provides that "[m]anagement contracts shall conform to all of the requirements contained in this section." *Id.* § 531.1. It proceeds to set out requirements for what a management contract must include. For example, it requires that management contracts "[e]numerate the responsibilities" of parties. *Id.* § 531.1(b). It then lists sixteen responsibilities that contracts must assign. *Id.* Additionally, this section requires contracts to "[p]rovide for the establishment and maintenance of satisfactory accounting systems." *Id.* § 531.1(c). It lists six requirements for accounting systems, including that they "[i]nclude an adequate system of internal accounting controls" and "[b]e susceptible to audit." *Id.* Under the heading "Governmental authority," the regulation also notes that the management contract must "[p]rovide that all gaming covered by the contract will be conducted in accordance with the

[9] The NIGC is authorized to promulgate regulations to implement IGRA. 25 U.S.C. § 2706(b)(10).

Indian Gaming Regulatory Act." *Id.* § 531.1(a).

These sections do not on their face require the Chair to review the validity of a governor's concurrence and whether the Indian lands at issue are eligible for gaming under § 2719(b)(1)(A). As Picayune interprets it, § 531.1(a) means that "the NIGC's approval of a management contract is lawful only if all gaming covered by the contract will be conducted in accordance with IGRA." Picayune's Mot. at 17. But the more natural reading, taken by the Federal Defendants and the Nominal Defendants, is that § 531.1(a) requires the Chair to ensure that a management contract include "*a provision* [providing] that all gaming conducted under the management contract will be conducted in accordance with IGRA." Fed. Defs.' Opp. at 10; Nominal Defs.' MTD at 12. Picayune does not assert that the management contract omits such a term; rather, it argues that the Chair abused his discretion, and acted contrary to law, in approving the management contract by not independently evaluating the validity of the Governor's concurrence and the Madera Parcel's compliance with the § 2719(b)(1)(A) exception. FAC at ¶¶ 62–74.

Picayune relies on the Ninth Circuit's decision in *AT&T Corp. v. Coeur d'Alene Tribe*, 295 F.3d 899 (9th Cir. 2002). In *AT&T*, the Ninth Circuit considered whether IGRA applied to a lottery that was administered on the reservation of an Indian tribe, but that allowed individuals to participate in the lottery from outside the reservation. *Id.* at 901–02, 906–10. The management contract between the tribe and a company allowed players to participate in the lottery telephonically. *Id.* at 902. The court found that IGRA's "statutory framework suffices to demonstrate that the NIGC must consider the legality of Class III gaming before approving . . . management contracts." *Id.* at 907–08. It noted that the Chair "is statutorily obligated to reject [management contracts]" when the gaming covered by them "does not conform to IGRA." *Id.* at 909. But *AT&T* did not address, and it does not resolve, the question of whether the Chair must review the validity of a governor's concurrence under section 2719(b)(1)(A) when approving a management contract, when the Secretary received and acted upon the Governor's concurrence letter years earlier.

Here, when the Secretary took the Madera Parcel into trust, he noted in the 2012 record of decision that "IGRA requires that the Governor concur in the Secretary's two-part determination

which he did by letter dated August 30, 2012." Joint Appendix at 1612, 1617, *Stand Up for California! v. U.S. Dep't of the Interior*, 204 F. Supp. 3d 212 (D.D.C. 2016) (No. 12-2039). As a result, the record of decision explained, "[t]he land can, therefore, be acquired in trust for" North Fork. *Id.* Picayune subsequently challenged the validity of the Governor's concurrence in the D.C. litigation, but the D.C. Circuit found Picayune had forfeited that claim by abandoning it. *See Stand Up*, 879 F.3d at 1186.

The Secretary thereafter issued procedures in 2016 that provide:

> [North Fork] may . . . engage in Class III Gaming only on eligible Indian lands held in trust for the Tribe, located within the boundaries of the Madera Parcel, as those boundaries exist as of the execution date of these Secretarial Procedures, as legally described and represented on the map at Appendix A, and on which Class III Gaming may lawfully be conducted under IGRA.

Doc. 34-2 at 261 (Sec. 4.2). On a fair reading, the 2016 Secretarial Procedures imply that the Secretary determined that class III gaming on the Madera Parcel complied with IGRA.[10] Given this record, Picayune fails to show the Chair was required to revisit the authorization for gaming on the Madera Parcel, by reviewing the validity of the Governor's concurrence under § 2719(b)(1)(A), before approving North Fork's management contract in 2024.

**3. Consequence for Picayune's APA Claim**

Agency action is arbitrary and capricious if an agency:

> [R]elied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

---

[10] The Secretarial Procedures and the record of decision in the D.C. litigation are public records that may also be considered on the motions to dismiss, in addition to on the motion for preliminary injunction. These are public records the "court may take judicial notice [of] . . . without converting [the] motion to dismiss into a motion for summary judgment." *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001). At the hearing, counsel for North Fork noted that the Secretary "act[ed] on the basis" of the Governor's concurrence, as memorialized in the Secretary's 2012 record of decision, and that the District of Columbia litigation referenced this record. Doc. 62 at 72:2–14. Picayune submitted the Secretarial Procedures with its motion for a preliminary injunction and its IGRA claim is premised on them. *See* Doc. 34-2 at 246; *see also* FAC. Picayune's motion also discusses the D.C. Circuit decision. *See* Picayune's Mot. at 24 n.6.

*San Luis Obispo Mothers for Peace v. U.S. Nuclear Regul. Comm'n*, 100 F.4th 1039, 1055 (9th Cir. 2024) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). "Arbitrary and capricious" is used "interchangeably" with "abuse of discretion." *Tao v. U.S. Citizenship & Immigr. Servs.*, No. 2:19-CV-02675-JAK (AJRx), 2025 WL 4631999, at *5 n.4 (C.D. Cal. Nov. 20, 2025). Agency action is not in accordance with law if it violates "any law, not merely those laws that the agency itself is charged with administering." *Am. Fed'n of State Cnty. & Mun. Emps., AFL-CIO v. U.S. Office of Mgmt. & Budget*, 813 F. Supp. 3d 944, 964 (N.D. Cal. 2025) (internal citation omitted).

Picayune's claim is premised on its argument that the Chair's approval of the management contract was arbitrary and capricious, an abuse of discretion, or otherwise contrary to law because the Chair failed to review the management contract for compliance with § 2719(b)(1)(A) and failed to reject the management contract based on the alleged invalidity of the Governor's concurrence. FAC at ¶¶ 62–74. But as the Chair was not required to review the validity of the Governor's concurrence when approving the management contract, Picayune cannot show that the Chair's approval was arbitrary and capricious, an abuse of discretion, or contrary to law. Therefore, Picayune is unlikely to succeed on this claim.

Even assuming the Chair were required to review the validity of the Governor's 2012 concurrence letter, Picayune would still fail to show a likelihood of success on its claim that the Chair's 2024 approval of the management contract was arbitrary and capricious or an abuse of discretion. The Chair approved the management contract in January 2024, nearly two years *before* the California Court of Appeal's December 2025 decision finding the Governor's concurrence "void ab initio." *See Picayune Rancheria of Chukchansi Indians v. North Fork Rancheria of Mono Indians*, 117 Cal. App. 5th 91, 113–14 (Cal. Ct. App. 2025).[11] The court

[11] The earlier decision by the California Court of Appeal, in 2021, held only that the Governor's concurrence had been annulled by the rejection of Proposition 48, not that it was invalid when issued in 2012. *See Stand Up for California! v. State*, 64 Cal. App. 5th 197, 216 (Cal. Ct. App. 2021). While IGRA required that the governor concur in the Secretary's determination to allow gaming on the Madera Parcel, the Secretary did receive such a concurrence letter from the governor, in 2012. It would undermine IGRA's exception at § 2719(b)(1)(A) if a state could retroactively revoke or annul for federal law purposes, years after the fact, a governor's

cannot conclude that Picayune has established a likelihood of succeeding on the claim that the Chair's approval was arbitrary and capricious or an abuse of discretion.[12]

**E. Picayune's IGRA Claim**

Picayune's second claim is that class III gaming on the Madera Parcel violates the Secretarial Procedures because those Procedures only allow gaming that may be lawfully conducted under IGRA. Picayune argues that as "the Governor never issued a valid concurrence," class III gaming on the Madera Parcel does not meet the § 2719(b)(1)(A) exception and is therefore unlawful under IGRA. FAC at ¶¶ 75–89. North Fork moves to dismiss this claim, and opposes the preliminary injunction, arguing both that IGRA does not provide Picayune a cause of action to sue based on an alleged violation of the Secretarial Procedures, and that North Fork has sovereign immunity on this claim. North Fork's MTD at 17–23, 29; North Fork's Opp. at 15–16.

As addressed below, while Picayune has a cause of action under § 2710(d)(7)(A)(ii), North Fork has sovereign immunity in this case. Picayune therefore fails to establish a likelihood of success on its IGRA claim.

**1. Picayune's § 2710(d)(7)(A)(ii) Claim**

Picayune brought suit under § 2710(d)(7)(A)(ii), which establishes a cause of action for a "State or Indian tribe to enjoin class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact . . . that is in effect." *See* FAC at ¶ 77. It is uncontested that there is no tribal-state compact currently in effect. Picayune Mot. at 13; North Fork's MTD at 29. Picayune's suit is instead based on alleged violations of the Secretarial Procedures issued in 2016. FAC at ¶¶ 51, 78–85. IGRA provides the Secretary the authority to enforce procedures

---

concurrence that the governor had conveyed to the Secretary. *See North Dakota v. United States*, 460 U.S. 300, 321 (1983) (explaining that a governor's consent, though required for federal acquisition of wetlands easements, could not subsequently be revoked at will by state, as doing so would undermine purpose of federal statute).

[12] To the extent Picayune argues that it has nonetheless shown a serious question going to the merits, as addressed below, it fails to show a likelihood of irreparable harm or that the balance of the hardships weighs in its favor.

issued by the Secretary. § 2710(d)(7)(A)(iii).

The Ninth Circuit's recent decision in *Blue Lake Rancheria v. Kalshi, Inc.*, No. 25-7504, 2026 WL 2728466 (9th Cir. Sep. 16, 2026), establishes that § 2710(d)(7)(A)(ii) also provides a cause of action for suits to enjoin class III gaming on Indian lands in violation of a tribe's secretarial procedures. The court noted that "once implemented, secretarial procedures are 'functionally equivalent' to compacts." *Id.* at *7. It held that "[a]lthough the Secretary is empowered to bring suit under 2710(d)(7)(A)(iii) to enforce secretarial procedures, that provision does not circumscribe . . . [t]ribes' ability to sue to enjoin class III gaming activity under subsection 2710(d)(7)(A)(ii)." *Id.* (internal quotations omitted). North Fork argues that *Blue Lake Rancheria* does not control here because *Blue Lake* concerned a tribe suing a non-tribe to enjoin gaming that was in violation of the tribe's secretarial procedures. Doc. 50 at 17; *see also Blue Lake Rancheria*, 2026 WL 2728466, at *2, 5. In contrast, here Picayune asserts that North Fork's gaming will violate North Fork's own Secretarial Procedures. Doc. 50 at 17.

To the extent North Fork argues that section 2710(d)(7)(A)(ii) does not authorize a cause of action by another tribe to enjoin gaming in alleged violation of North Fork's Secretarial Procedures, that argument is foreclosed by *Blue Lake Rancheria*.[13] IGRA provides that "*a* . . . tribe" may sue to enjoin class III gaming "in violation of *any*" tribal-state compact. § 2710(d)(7)(A)(ii) (emphasis added). In *Blue Lake Rancheria*, the Ninth Circuit construed this provision to authorize a tribe to sue to enjoin class III gaming in violation of secretarial procedures. *Blue Lake Rancheria*, 2026 WL 2728466, at *2. The statute does not limit suit under § 2710(d)(7)(A)(ii) to a tribal plaintiff suing to enjoin a violation of its own compact or secretarial procedures. Accordingly, Picayune has a cause of action under § 2710(d)(7)(A)(ii).

**2. North Fork's Tribal Sovereign Immunity**

North Fork argues that it has sovereign immunity from this suit, asserting § 2710(d)(7)(A)(ii) does not abrogate its tribal sovereign immunity when it is sued for an alleged violation of its own Secretarial Procedures. North Fork's MTD at 17–20. Whether a statute

---

[13] To the extent North Fork's argument is based on tribal sovereign immunity, it is addressed in the next section.

abrogates tribal sovereign immunity is an "analytically distinct" question from whether it provides a cause of action. *See FDIC v. Meyer*, 510 U.S. 471, 483–84 (1994) (internal citation omitted).

Indian tribes exercise "inherent sovereign authority" as "domestic dependent nations." *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 788 (2014) (internal citation omitted). Though they "are subject to plenary control by Congress . . . they remain 'separate sovereigns pre-existing the Constitution.'" *Id.* (quoting *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978)). "Immunity from suit has been recognized by the courts of this country as integral to the sovereignty and self-governance of Indian tribes." *Kyrstal Energy Co. v. Navajo Nation*, 357 F.3d 1055, 1056 (9th Cir. 2004). "[U]nless and 'until Congress acts, the tribes retain' their historic sovereign authority." *Bay Mills*, 572 U.S. at 788 (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)).

"[A]n abrogation must be 'unequivocally expressed' . . . in 'explicit legislation.'" *Krystal*, 357 F.3d at 1056 (quoting *Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 759 (1998)). There is a strong "presumption favoring tribal sovereign immunity." *Demontiney v. United States ex rel. Dep't of Interior*, 255 F.3d 801, 811 (9th Cir. 2001). "[A]brogation of tribal sovereign immunity cannot be implied." *Id.* (internal citation omitted). The court must be able to say "with perfect confidence that Congress meant . . . to abrogate . . . sovereign immunity." *Deschutes River All. v. Portland Gen. Electric Co.*, 1 F.4th 1153, 1159 (9th Cir. 2021) (internal citation omitted).

To abrogate tribal sovereign immunity there must be a "clear statement of congressional intent." *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, 599 U.S. 382, 387 (2023). "If 'there is a plausible interpretation of the statute' that preserves sovereign immunity, Congress has not unambiguously expressed the requisite intent." *Id.* at 388 (quoting *FAA v. Cooper*, 566 U.S. 284, 290 (2012)). The clear statement rule though "is not a magic-words requirement." *Id.* "To abrogate sovereign immunity unambiguously, Congress need not state its intent in any particular way." *Id.* (internal citation omitted). "The clear-statement question is simply whether, upon applying traditional tools of statutory interpretation, Congress's

abrogation of tribal sovereignty is clearly discernable from the statute itself." *Id.* (internal citation omitted).

Picayune must therefore show that Congress "unequivocally expressed" its intent to abrogate tribal sovereign immunity on its claim. *Krystal*, 357 F.3d at 1056 (internal citation omitted). Picayune relies on section § 2710(d)(7)(A)(ii), which authorizes "any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." § 2710(d)(7)(A)(ii). On its face, the text of § 2710(d)(7)(A)(ii) does not refer to secretarial procedures. In contrast, IGRA expressly authorizes the Secretary to enforce secretarial procedures against a tribe in section 2710(d)(7)(A)(iii).

The question is whether § 2710(d)(7)(A)(ii) nonetheless abrogates a tribe's sovereign immunity for a suit against the tribe to enjoin an alleged violation of the tribe's secretarial procedures. While *Blue Lake Rancheria* found that this provision provided a tribe with a cause of action to enjoin gambling activity by a non-tribe in violation of the tribe's secretarial procedures, that case did not involve a tribal defendant or tribal sovereign immunity. *See Blue Lake Rancheria*, 2026 WL 2728466, at *7. *Blue Lake Rancheria* does not resolve whether § 2710(d)(7)(A)(ii) abrogates tribal sovereign immunity as to a claim seeking to enjoin a tribe's gaming activity based on the tribe's secretarial procedures. *See Blue Lake Rancheria*, 2026 WL 2728466, at *7.

In *Bay Mills*, a case involving gaming activity in alleged violation of a tribal-state compact, the Supreme Court held that § 2710(d)(7)(A)(ii) "partially abrogates tribal sovereign immunity," allowing states or tribes to sue a tribe to enjoin gaming in violation of a tribal-state compact. *Bay Mills*, 572 U.S. at 791 (2014). But the Court specifically noted that this abrogation of tribal sovereign immunity did not cover all suits to enjoin class III gaming on Indian lands:

> [T]he statutory abrogation does not even cover all suits to enjoin gaming on Indian lands . . . . Section 2710(d)(7)(A)(ii), recall, allows a State to sue a tribe not for all "class III gaming activity located on Indian lands" (as Michigan suggests), but only for such gaming as is "conducted in violation of any Tribal-State compact . . . that is in effect." Accordingly, if a tribe opens a casino on Indian lands before negotiating a compact, the

> surrounding State cannot sue; only the Federal Government can enforce the law. . . . In fact, a State *cannot* sue to enjoin all gaming in Indian country; that gaming must, in addition, violate an agreement that the State and tribe have mutually entered.

*Id.* at 795 n.6 (emphasis in original).

The Supreme Court's decision in *Bay Mills* is consistent with the narrow reading of § 2710(d)(7)(A)(ii)'s abrogation of tribal sovereign immunity urged by North Fork. In *Bay Mills*, the Supreme Court held that this section, which explicitly applies to gaming *on* Indian lands, does not abrogate tribal sovereign immunity with respect to suits for gaming *off* Indian lands. *Bay Mills*, 572 U.S. at 791. Even if this might appear "senseless," courts do "not revise legislation . . . just because the text as written creates an apparent anomaly." *Id.* at 793–94. "Truth be told, such anomalies often arise from statutes, if for no other reason than that Congress typically legislates by parts—addressing one thing without examining all others that might merit comparable treatment." *Id.* Courts have "no roving license, in even ordinary cases of statutory interpretation, to disregard clear language simply on the view . . . that Congress must have intended something broader." *Id.* (internal citation omitted).

The Ninth Circuit has also noted "the canon of construction obligating [courts] to construe a statute abrogating tribal rights narrowly." *Rincon Band of Luiseno Mission Indians of Rincon Rsrv. v. Schwarzenegger*, 602 F.3d 1019, 1028 n.9 (9th Cir. 2010). While § 2710(d)(7)(A)(ii) clearly abrogates tribal sovereign immunity as to suits to enjoin gaming in violation of a tribe's tribal-state compact, interpreting the statute narrowly argues for finding that this abrogation of immunity does not extend to a claim asserting that the tribe is conducting gaming activity in violation of its secretarial procedures. Section 2710(d)(7)(A)(iii)'s express authorization for the Secretary to enforce the secretarial procedures against a tribe further supports reading § 2710(d)(7)(A)(ii)'s abrogation of sovereign immunity narrowly.

IGRA's framework also counsels for reading § 2710(d)(7)(A)(ii)'s abrogation of sovereign immunity as not extending to a claim seeking to enjoin a tribe's gaming as violative of its secretarial procedures. Under IGRA, secretarial procedures are imposed on the tribe (and the state) only when the tribe and the state have been unable to agree on a compact and a court has

found that the state has refused to negotiate in good faith with the tribe. *See* 25 U.S.C. §2710(d)(7). Congress could rationally have determined that a tribe's sovereign immunity should be abrogated to allow suits against the tribe to enjoin gaming in violation of an agreement that the tribe voluntarily entered into with the state, but that the tribe's sovereign immunity from suit should be preserved when the tribe and state are operating under procedures imposed by the Secretary. § 2710(d)(7)(A)(iii) ensures that the Secretary may enforce the secretarial procedures against the tribe when needed. This plausible reading is consistent with the plain text of § 2710(d)(7)(A).

Though IGRA has been in effect for decades, Picayune cites no case holding that § 2710(d)(7)(A)(ii) abrogates tribal sovereign immunity in a suit against a tribe alleging the tribe is conducting class III gaming in violation of its own secretarial procedures. *See* Doc. 46 at 15–18; Doc. 47 at 9. Instead, it primarily relies on two cases that are not about sovereign immunity. First, it argues that *Stand Up for California! v. United States Department of the Interior*, 959 F.3d 1154 (9th Cir. 2020), held that "compacts and Secretarial Procedures are equivalent for purposes of § 2710." Doc. 46 at 16. But this case did not hold that tribal-state compacts and secretarial procedures are equivalent for all purposes under IGRA. *See Stand Up*, 959 F.3d at 1158–62. It held that IGRA's exemption to the Johnson Act's prohibition on the use of gambling devices in Indian country for gaming pursuant to tribal-state compacts also exempts gaming pursuant to secretarial procedures. *Id.* at 1158–59. The court concluded "that IGRA does not at once authorize Secretarial Procedures, while simultaneously making gaming pursuant to those Procedures illegal and robbing the Procedures of their remedial force." *Id.* at 1161.[14] Second,

[14] In *Stand* Up, the Ninth Circuit looked to certain other IGRA provisions in which not reading tribal-state compacts as equivalent to secretarial procedures would produce "inconsistencies, nullities, and internal contradictions within IGRA." *Stand Up*, 959 F.3d at 1159. For example, IGRA provides that "[c]lass III gaming activities shall be lawful on Indian lands *only* if," among other things, they are "conducted in conformance with a *Tribal-State compact*." 25 U.S.C. § 2710(d)(1) (emphasis added). But the Secretary issues procedures "only when no Tribal-State compact has been reached" as they "are the final remedy for a state's refusal to negotiate." *Stand Up*, 959 F.3d at 1159 (citing § 2710(d)(7)(B)(vii)). "If Secretarial Procedures are not treated as equivalent to Tribal-State compacts for the purpose of § 2710(d)(1), then Secretarial Procedures can never comply with the *only* situations in which class III gaming is lawful on Indian lands." *Id.* at 1159–60. On the contrary, "Secretarial Procedures would always, by definition, violate the

Picayune relies on *Blue Lake Rancheria*, which, as discussed, found that § 2710(d)(7)(A)(ii) provides a cause of action for a tribe to enjoin gaming by a non-tribe in violation of the tribe's secretarial procedures. 2026 WL 2728466, at *7–8.

These cases certainly establish that "Tribal-State compact" and "secretarial procedures" should be understood synonymously for some purposes in the statute, particularly where not doing so would undermine the purpose of the secretarial procedures authorized by the statute. But they do not address the abrogation of tribal sovereign immunity. And, unlike in *Stand Up*, ensuring the purpose of secretarial procedures would not be promoted here by an expansive reading of § 2710(d)(7)(A)(ii)'s abrogation of sovereign immunity that would include a suit against a tribe to enjoin the tribe's gaming activity based on its alleged violation of its secretarial procedures.

Picayune must show that IGRA is unmistakably clear in abrogating tribal sovereign immunity for its IGRA claim against North Fork. It fails to do so. For the reasons addressed above, the court construes § 2710(d)(7)(A)(ii)'s abrogation of tribal sovereign immunity narrowly and finds that it does not abrogate North Fork's sovereign immunity on Picayune's IGRA claim seeking to enjoin North Fork's gaming activities based on North Fork's alleged violation of the Secretarial Procedures. As North Fork has sovereign immunity on Picayune's IGRA claim, Picayune cannot establish a likelihood of success on the merits on this claim. Picayune therefore fails to establish this necessary element for a preliminary injunction.[15]

**F. <u>Other Preliminary Injunction Factors</u>**

Picayune also fails to show it is likely to suffer irreparable harm or that the balance of the equities and the public interest favor it.

///

///

---

very Act that creates those Procedures." *Id.* at 1160.

[15] To the extent that Picayune argues that it has nonetheless shown a serious question going to the merits, as addressed below it fails to show a likelihood of irreparable harm or that balance of the hardships weighs in its favor.

### 1. Likelihood of Irreparable Harm

Picayune argues that unlawful class III gaming on the Madera Parcel would irreparably harm it by resulting in a loss of thirty percent to fifty percent of its gaming revenue at some point in time. Picayune's Mot. at 27–30. It claims that the loss of gaming revenue would damage it in a variety of ways, including by undermining the services that it can provide tribe members. *Id.*; Doc. 47 at 12–15.

"Monetary injury is not normally considered irreparable." *hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F4th 1180, 1188 (9th Cir. 2022) (internal citation omitted). But this is "because such injury can [often] be remedied by a damage award." *Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991). Here, Picayune argues that it cannot obtain a damages award. The APA waives sovereign immunity "for suits against the federal government in which the plaintiff is '*seeking relief other than money damages*.'" *Weber v. Dep't of Veterans Affs.*, 521 F.3d 1061, 1066 (9th Cir. 2008) (quoting 5 U.S.C. § 702). The APA has a "prohibition on suits for money damages." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999). Nor could Picayune obtain monetary damages on its IGRA claim. IGRA does not provide for monetary damages for claims under § 2710(d)(7)(A)(ii). It authorizes a cause of action to "enjoin" class III gaming activity. *Id.*

But Picayune fails to establish a likelihood of irreparable harm. First, its delay in seeking a preliminary injunction and stay weighs heavily against it. "A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief." *Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984). This is because a delay "implies a lack of urgency and irreparable harm." *Oakland Trib., Inc. v. Chron. Pub. Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985). "Although there is not a bright-line rule," even a "delay of two months weighs against finding irreparable harm." *United Farm Workers v. U.S. Dep't of Lab.*, No. 1:25-cv-1614 KES EGC, 2026 WL 1345918, at *16 (E.D. Cal. May 14, 2025). Picayune could have brought suit with the same claims after the California Court of Appeal decided *Picayune Rancheria* in December 2025, and, at the latest, it could have done so after the California Supreme Court denied review of that decision on April 1, 2026. The California Court of Appeal

held in that case that, as a matter of California law, the Governor's concurrence was void ab initio. *Picayune Rancheria*, 117 Cal. App. 5th at 114. That decision provides the crux of Picayune's argument. *See* FAC at ¶¶ 62–89. But Picayune did not file its complaint until June 5, 2026, and it did not move for a preliminary injunction and stay until August 28, 2026. *See* Docs. 1, 34. Picayune's motion was brought shortly before North Fork's intended casino opening, after North Fork had incurred substantial financial and legal obligations related to the casino.[16]

Picayune also fails to submit sufficient evidence to show a likelihood of irreparable harm. Picayune must establish that "in the absence of the injunction," it is likely to suffer irreparable harm. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). This is harm "that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com, LLC v. Ironport Sys., Inc.,* 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004). Picayune argues that the North Fork Casino will be near Highway 99, whereas Picayune's Casino is on Highway 41, which is "a smaller, less-trafficked highway." FAC at ¶ 46. Picayune argues that the relative proximity of the two casinos creates an inference that there will be competition between them, and that Picayune will therefore lose revenue. It is certainly possible that some patrons who would have gone to Picayune's casino may instead go to the North Fork Casino, and that Picayune's revenue may decline at some point. But it is also possible that the increased concentration of casinos will attract new customers, potentially benefiting both tribes. Picayune's speculation as to potential harm does not meet its burden.

Though tribe members allege that Picayune will lose thirty percent to fifty percent of its gaming revenue, they do not explain the basis for this estimate. *See* Doc. 34-3 at ¶¶ 12–15; Doc. 34-4 at ¶¶ 5–7; Doc. 34-8 at ¶¶ 15–17. Picayune relies heavily on a 2019 study, but it submitted that study only with its reply brief and the study is years out of date. *See* Doc. 47-2 at 17. Instead of providing an updated analysis, Picayune provides a single page statement that

---

[16] At the hearing, counsel for Picayune argued that, if Picayune had sued too early, it may not have been able to show standing as its injury would not have been imminent. Doc. 62 at 47:6–48:14. But Picayune certainly had standing no later than in April 2026, when the California Supreme Court denied review of the *Picayune Rancheria* decision.

alleges that the 2019 study is still "representative" of Picayune's anticipated harm. *Id.* at 48. But there is virtually no analysis supporting this point. Even if the study were correct that Picayune is likely to lose revenue at some point in the future, it does not show that Picayune is likely to lose such revenue in the immediate term and that the harm could be remedied only by a preliminary injunction or stay. Picayune does not meet its burden to show the financial impact the North Fork Casino is likely to have on Picayune in the absence of a preliminary injunction or stay pending the resolution of this case, or that gaming at the North Fork casino will lead to irreparable harm to Picayune.

**2. The Balance of the Equities and the Public Interest**

Nor has Picayune shown that the balance of the equities and the public interest favor a preliminary injunction. It is well-established that when "the government is a party to a case in which a preliminary injunction is sought, the balance of the equities and the public interest factors merge." *Roman v. Wolf*, 977 F.3d 935, 940–41 (9th Cir. 2020). "To determine the balance of equities, the court must 'balance the interests of all parties and weigh the damage to each.'" *Nat'l Ass'n of Wheat Growers v. Zeise*, 309 F. Supp. 3d 842, 853 (E.D. Cal. 2018) (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138 (9th Cir. 2009)). "[B]alancing the equities is not an exact science." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018), and "[t]he assignment of weight to particular harms is a matter for district courts to decide." *Earth Island Inst. v. Carlton*, 626 F.3d 462, 475 (9th Cir. 2010).

Picayune has not established that these factors support it. Picayune argues that the public interest favors an injunction because "[u]nder Proposition 48, California voters unequivocally rejected class III gaming on the Madera Parcel." Picayune's Mot. at 32. But the injunction it seeks would result in enormous and immediate financial harm to North Fork, while potentially providing some unquantified benefit to Picayune over time. *See* Doc. 43-1 at ¶¶ 1–34. Even assuming Picayune had established a likelihood of irreparable harm, the balance of hardships tilts strongly in the other direction. Picayune has been successfully operating its casino for years, *see* Picayune's Mot. at 31, and while it may face some increased competition from the North Fork Casino, a preliminary injunction would immediately cause extensive, and potentially permanent,

losses to North Fork. *See* Doc. 43-1 at ¶¶ 28–33.[17]

**G. Motions to Dismiss**

For the reasons discussed above, North Fork's and the Nominal Defendants' motions to dismiss must be granted as to the APA claim. Picayune's APA claim is based on its argument that the Chair violated the APA by approving the management contract despite the invalidity of the Governor's concurrence. But as the Chair was not required to review the validity of the Governor's concurrence under § 2719(b)(1)(A) prior to approving the management contract, Picayune's APA claim fails. The APA claim must also be dismissed as to North Fork as North Fork has sovereign immunity from this suit, as addressed above. As these defects could not be cured by amendment, the dismissal as to North Fork and the Nominal Defendants is without leave to amend. *See Intri-Plex Techs., Inc. v. Crest Grp., Inc.*, 499 F.3d 1048, 1056 (9th Cir. 2007).[18]

Unlike its first cause of action, which is not limited to a particular defendant, Picayune explicitly brings its IGRA cause of action solely against North Fork. *See* FAC at 17.[19] In moving

---

[17] Picayune asserts that there is no inequity as North Fork "has known for years" that its activities may be unlawful. Picayune's Mot. at 31. But the Chair approved the management contract nearly three years ago, in January 2024. It was not until December 2025 that the California Court of Appeal determined that the Governor's concurrence was void ab initio. *See Picayune Rancheria*, 117 Cal. App. 5th at 113–14.

[18] North Fork also moves to dismiss the entire suit under Rule 12(b)(7) for "failure to join a party under Rule 19." Fed. R. Civ. P. 12(b)(7). But, as Picayune points out, Picayune *did* sue North Fork in this action. *See* Doc. 46 at 15 n.1. The text of Rule 12(b)(7) contemplates dismissal when the required entity has not been joined: The basis for dismissal is "*failure*" to join a party. Fed. R. Civ. P 12(b)(7) (emphasis added); *see WhatsApp Inc. v. NSO Grp. Techs. Ltd.*, 472 F. Supp. 3d 649, 662 (N.D. Cal. 2020). The text of Rule 19 asks whether "in that *person's* absence" the court can accord complete relief "among existing *parties*." Fed. R. Civ. P. 19(a)(1)(A) (emphasis added). In doing the Rule 19 analysis, courts ask "whether a *nonparty*" is necessary. *See, e.g.*, *EEOC v. Peabody W. Coal Co.*, 400 F.3d 774, 779 (9th Cir. 2005) (emphasis added). Given that the Federal Defendants have not moved to dismiss the APA claim, and as the court grants the motions to dismiss the APA claim as to North Fork and the Nominal Defendants, the court need not consider at this time whether the APA claim may proceed solely against the Federal Defendants.

[19] The heading under the second cause of action in Picayune's First Amended Complaint reflects that the IGRA claim is "[a]sserted [a]gainst North Fork." *See* FAC at 17. In introducing its second cause of action, Picayune asserts that North Fork is violating the Secretarial Procedures, and that Picayune is seeking "an injunction . . . barring North Fork from proceeding with unlawful gaming." FAC at ¶ 6.

to dismiss for failure to state a claim under Rule 12(b)(6), North Fork asserts that Picayune lacks a cause of action under § 2710(d)(7)(A)(ii). North Fork's MTD at 29. As addressed above, that argument fails based on *Blue Lake Rancheria*. But North Fork also references its sovereign immunity argument, asserting that its arguments under Rule 12(b)(7) "also compel dismissal under Rule 12(b)(6)." *Id.* The Ninth Circuit has explained that the proper vehicle for moving to dismiss based on tribal sovereign immunity is a Rule 12(b)(1) motion for lack of jurisdiction. *Acres Bonusing, Inc. v. Marston*, 17 F.4th 901, 907 (9th Cir. 2021); *Pistor v. Garcia*, 791 F.3d 1104, 1110–1111 (9th Cir. 2015). The Ninth Circuit has also described tribal sovereign immunity as "quasi-jurisdictional." *Pistor*, 791 F.3d at 1110–1111. And a court may also *sua sponte* dismiss a claim under Federal Rule 12(b)(6) "where the claimant cannot possibly win relief." *Omar v. Sea-Land Serv., Inc.*, 813 F.2d 986, 991 (9th Cir. 1987).

As addressed above, North Fork's tribal sovereign immunity bars Picayune's IGRA claim against North Fork. Section 2710(d)(7)(A)(ii) does not abrogate North Fork's sovereign immunity on Picayune's IGRA claim seeking to enjoin North Fork's gaming activities based on North Fork's alleged violation of the Secretarial Procedures. As Picayune cannot win relief on this claim, North Fork's motion to dismiss the IGRA claim is granted. As the dismissal is based on sovereign immunity, and there is no amendment that can save the IGRA claim against North Fork, the dismissal of North Fork is without leave to amend. Dismissal without leave to amend is proper when "it is clear that 'the complaint could not be saved by any amendment.'" *S.M.A. by Alford v. Modesto City Sch. Dist.*, 651 F. Supp. 3d 1177, 1191 (E.D. Cal. 2023) (quoting *Intri-Plex Techs.*, 499 F.3d at 1056).

///

///

///

///

///

///

///

## IV. CONCLUSION

Based on the foregoing analysis, the court concludes:

1. Picayune's motion for a preliminary injunction and stay is DENIED.
2. North Fork's motion to dismiss is GRANTED in part.
3. The Nominal Defendants' motion to dismiss the APA claim is GRANTED.
4. The APA claim (claim 1) is DISMISSED as to North Fork and the Nominal Defendants.
5. The IGRA claim (claim 2) is DISMISSED.

IT IS SO ORDERED.

Dated: October 29, 2026

UNITED STATES DISTRICT JUDGE